IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE ALEXANDER, | ) | CASE NO. 3:16-cv-02545 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Christine Alexander ("Plaintiff" or "Alexander") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her applications for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 21. As explained more fully below, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

Alexander protectively filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on May 2, 2014.[1] Tr. 65, 75, 112, 223-224, 225-230.[2] Alexander alleged a disability onset date of February 10, 2010. Tr. 65, 75, 112, 223, 225. She alleged disability due to major depression. Tr. 65, 75, 87, 97, 130, 133, 138, 145. Alexander's

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 9/28/2017).

[2] On January 30, 2017, the Commissioner filed a supplemental certified administrative record to correct the hyperlinks. Doc. 14. The supplemental transcript is filed as Doc. 14-1. Citations to the transcript are therefore made to the transcript filed as Doc. 14-1.

applications were denied initially (Tr. 130-135) and upon reconsideration by the state agency (Tr. 138-149). Thereafter, she requested an administrative hearing. Tr. 150-153. On October 15, 2015, Administrative Law Judge Hope G. Grunberg ("ALJ") conducted an administrative hearing. Tr. 23-64.

In her December 11, 2015, decision (Tr. 109-129), the ALJ determined that Alexander had not been under a disability, as defined in the Social Security Act, from February 10, 2010, through the date of the decision (Tr. 112, 123). Alexander requested review of the ALJ's decision by the Appeals Council. Tr. 20-21. On August 20, 2016, the Appeals Council denied Alexander's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-7.

## II. Evidence[3]

### A. Personal, vocational and educational evidence

Alexander was born in 1956 and was 59 years old at the time of the hearing. Tr. 29, 223. She receives food stamps and has medical insurance through Medicaid. Tr. 29. Before getting coverage through Medicaid, Alexander had a gap in medical coverage but she was never denied medical treatment due to a lack of insurance. Tr. 30. Alexander has a high school education. Tr. 32. She also received some additional job-related training through past employers. Tr. 32. Alexander's last job was through a temporary agency in 2013. Tr. 32. She worked for about a month doing various temporary jobs. Tr. 32-33. Ultimately, she ended up not working because she did not have reliable access to a phone she could be contacted at and paying for gasoline was difficult. Tr. 33. From 2008 until 2010, Alexander worked as a financial aid coordinator,

---

[3] Alexander alleged no severe physical impairments at the hearing and her challenge in this appeal is centered on her mental impairment claim. Accordingly, the evidence summarized herein pertains primarily to her mental impairments.

assisting students with loan applications.  Tr. 34.  Alexander worked as a human resources

employee and as an escrow officer, handling real estate closings.  Tr. 35-38.

**B.     Medical evidence**

**1.     Treatment history**

**a.  River Road Family Physicians (June 2010 through August 2012)**

On June 8, 2010, Alexander saw Dr. Jason L. Evans, M.D., of River Road Family

Physicians, regarding her depression.  Tr. 347.   Alexander relayed "everything is a mess."  Tr.

347.  She had stopped taking her Celexa because she was not sure that it was working.  Tr. 347.

After Alexander stopped taking her Celexa, she started to feel worse and was seeking an

alternative medication.  Tr. 347.  Dr. Evans started Alexander on Cymbalta.  Tr. 347.  Dr. Evans

"strongly encouraged [Alexander] not to experiment with her medication without talking with

[him]."  Tr. 347.

During a follow-up visit on July 8, 2010, Alexander reported minimal improvement from

the Cymbalta.  Tr. 345.  Dr. Evans continued Alexander on Cymbalta at an increased dosage.  Tr.

345.  Alexander saw Dr. Evans a month later on August 11, 2010, and reported that she did not

think that the Cymbalta was working.  Tr. 343.  Dr. Evans increased Alexander's Cymbalta

dosage again.  Tr. 344.

During a September 13, 2010, visit, Alexander reported that her anxiety and depression

had gotten worse.  Tr. 368.  Alexander had suicidal thoughts but no intent.  Tr. 368.  She was not

taking her medication as directed because she did not think that her medication was helping.  Tr.

368.  Increasing the Cymbalta did not improve her symptoms.  Tr. 368.  She felt the best when

she was taking citalopram.  Tr. 368.  Alexander was finding it hard to get motivated to find a job

because of the way she felt.  Tr. 368.  On physical examination, Dr. Evans observed normal

orientation, memory, attention, language and fund of knowledge; an anxious, but not depressed, mood and affect; normal speech; normal thought processes; and no delusions or hallucinations. Tr. 369.  Dr. Evans also observed that Alexander's judgment and insight were impaired, noting that Alexander expected to be able to handle her problems by reading self-help books even though she had been symptomatic for months.  Tr. 369.  Dr. Evans diagnosed anxiety and depression.  Tr. 369.  He discontinued Cymbalta and started Alexander on Lexapro.  Tr. 369. Alexander declined an offer for counseling.  Tr. 369.

Alexander saw Dr. Evans in June of 2011.  Tr. 363-365.  She reported that her depression had gotten worse.  Tr. 363.  She reported a depressed mood, loss of interest or pleasure in activities, insomnia, feelings of worthlessness, feelings of guilt, trouble concentrating, anxiety and a recent 5 pound weight gain.  Tr. 363.  On examination, Dr. Evans observed that Alexander's mood and affect were agitated and depressed.  Tr.  364.  Alexander demonstrated impaired judgment and insight.  Tr. 364.  Her thought processes and rate of thought were normal and she exhibited no delusions or hallucinations.  Tr. 364.  Dr. Evans prescribed Sertraline.[4]  Tr. 364.  The following month, on July 21, 2011, Alexander saw Dr. Evans again with continued complaints of depression. Tr. 360-362.  Alexander felt that she was doing better since starting Sertraline but she felt there was room for improvement.  Tr. 360.  Dr. Evans' physical examination findings were normal.  Tr. 361.  Dr. Evans continued to diagnose depression and anxiety and he continued Alexander on Sertraline at an increased dosage.  Tr. 361.  A month later, on August 22, 2011, Alexander reported that her depression had improved since her prior visit.  Tr. 359.  Overall, Alexander was feeling better.  Tr. 358. She was interested in increasing her medication dosage.  Tr. 358.  Physical examination findings were normal.  Tr. 359.  Dr.

---

[4] Zoloft is the brand name for Sertraline.  http://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940 (last visited 9/28/2017).

Evans continued Alexander on Sertraline at an increased dosage and advised her to follow up with him in two months or sooner, if needed. Tr. 359. During an October 2011 follow-up visit with Dr. Evans, Alexander reported that her depression had improved since her prior visit. Tr. 356. She reported medication compliance and no side effects. Tr. 356. Physical examination findings were normal. Tr. 357. Dr. Evans recommended a psychology referral for evaluation and treatment and follow up with him in three months. Tr. 357. It does not appear that any further treatment for mental health issues occurred until October 9, 2013 (discussed below).

**b. Rescue Mental Health Services (October 2013)**

On October 9, 2013, Alexander presented herself to Rescue Mental Health Services on a voluntary basis for an evaluation due to increased depression, an inability to sleep and suicidal ideation with no plan. Tr. 1285-1293. Alexander reported that she had not taken her Zoloft for a number of months because she was unable to afford it. Tr. 1285. She reported feeling overwhelmed and hopeless and was having suicidal thoughts. Tr. 1285. Upon assessment, Alexander presented herself with a flat affect, she was depressed, and appeared sad. Tr. 1285. She reported that she was not eating and had researched ways in which to kill herself. Tr. 1285. Alexander minimized her alcohol use but reported having blackouts. Tr. 1285. Alexander recently started living in her car because her daughter kicked her out of the house she had been living in since August. Tr. 1285. Before living with her daughter, Alexander lived in an apartment. Tr. 1285. She gave the apartment up because her friends had been paying her rent and she had been unemployed for three years. Tr. 1285. Alexander's diagnoses included major depressive disorder, recurrent, severe without psychotic features and alcohol abuse. Tr. 1288.

She was assessed a GAF score of 35.[5]  Tr. 1288.  Due to her suicidal ideations, Alexander was admitted to Mercy St. Vincent Medical Center for inpatient care.  Tr. 384, 1289.

### c.  Mercy St. Vincent Medical Center

Per the referral from Rescue Crisis for inpatient care, Alexander was admitted to Mercy St. Vincent Medical Center on October 9, 2013, and discharged on October 12, 2013.  Tr. 384-394.  On admission, Alexander was seen by Bhupinder S. Chahal, M.D., a psychiatrist.  Tr. 385.  Alexander presented herself with a specific plan to harm herself.  Tr. 384.  She also presented with feelings of being down, depressed and hopeless, loss of interest in usual activities, feelings of guilt, worthlessness or loss of self-confidence; agitation; pressured speech, racing thoughts, and mood swings.  Tr. 384.  Alexander reported receiving past psychiatric treatment and that a family member had committed suicide.  Tr. 384.  Alexander's mental status examination revealed that she was alert, cooperative, appropriately dressed, her affect was appropriate, her mood was anxious and depressed, her thought process was goal directed, and her thought content presented no evidence of delusions or hallucinations.  Tr. 384.  She was positive for suicidal ideation but negative for homicidal ideation.  Tr. 384.  Her gross cognitive functions were fair, she was oriented to place, and her insight and judgment were fair.  Tr. 384.  Dr. Chahal's diagnostic impression was bipolar I disorder, depressed episode and severe, and alcohol abuse.

---

[5] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *Id.*  With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

Tr. 384. Alexander's GAF score was 21-30.[6] Tr. 385. Dr. Chahal admitted Alexander for inpatient psychiatric treatment. Tr. 385.

On October 11, 2013, Alexander had symptoms of depression, racing thoughts, mood fluctuations, and irritable moods that were rated moderate in severity. Tr. 390. Dr. Chahal's assessment was that Alexander's condition was gradually improving and psychotherapy session was supportive. Tr. 391. The next day, on October 12, 2013, Dr. Chahal saw Alexander. Tr. 391. Alexander reported that she was feeling better and the severity of her symptoms had stabilized. Tr. 391. She was tolerating her medication well. Tr. 391. She denied any suicidal or homicidal ideations. Tr. 391. Dr. Chahal discussed a discharge plan and follow up. Tr. 391. Later that day, Alexander was discharged. Tr. 391, 406-408. Alexander's diagnoses at discharge were bipolar I disorder, most recent episode (or current) mixed, unspecified and stressors of moderate severity. Tr. 406-407. Alexander's GAF score was 51-60.[7] Tr. 407.

### d. Harbor Behavioral Healthcare (October 2013 through September 2015)

On October 23, 2013, Alexander was seen at Harbor for a psychiatric evaluation following her discharge from Mercy St. Vincent's Hospital. Tr. 535-551. Amy Clark, CNS, conducted the evaluation. Tr. 539. Alexander's mental status examination was unremarkable. Tr. 535-537. Ms. Clark diagnosed Alexander with major depressive disorder, recurrent, severe without psychotic features and assigned a GAF score of 50.[8] Tr. 538. Ms. Clark continued

---

[6] A GAF score between 21 and 30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day; no job, home, or friends)." DSM-IV-TR, at 34.

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR, at 34.

[8] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." DSM-IV-TR, at 34.

Alexander on Zoloft and Latuda.  Tr. 539.  Latuda was continued at a decreased dosage because Alexander complained that the Latuda made her drowsy.  Tr. 539.  Ms. Clark recommended that Alexander reduce her alcohol intake and start counseling and case management.  Tr. 539.

On October 31, 2013, Alexander saw Erin Partin, RN, for a medication visit.  Tr. 527-529.  Alexander reported poor sleep and an increased appetite, which she attributed to not smoking.  Tr. 527.  Alexander rated both her depression and anxiety as 10/10, with 10 being the worst.  Tr. 527.  Ms. Partin observed that Alexander was clean and dressed neatly and appropriately.  Tr. 527.  Ms. Partin also observed that Alexander was pleasant but guarded; her mood was euthymic; her affect was congruent; her range was constricted; her insight and judgment were good; and her attention and memory were intact.  Tr. 527-528.  Alexander's diagnosis remained major depressive disorder, recurrent, severe without psychotic features, with a GAF of 50.  Tr. 528.  No changes were made to Alexander's medications.  Tr. 529.

Alexander continued to receive medication management services through September 2015.[9]  Tr. 517-519 (11/11/13), Tr. 493-495 (12/5/13), Tr. 480-482 (12/20/13), Tr. 474-475 (1/14/14), Tr. 464-466 (1/21/14), Tr. 452-454 (1/31/14), Tr. 438-440 (2/11/14), Tr. 423-426 (2/25/14), Tr. 654-657 (4/1/14), Tr. 661-663 (4/9/14), Tr. 670-673 (5/14/14), Tr. 838-841 (6/25/14), Tr. 833-836 (7/23/14), Tr. 828-831 (9/4/17), Tr. 823-826 (10/16/14), Tr. 1271-1273 (12/9/14), Tr. 1266-1269 (2/12/15), Tr. 1261-1264 (4/9/15), Tr. 1256-1259 (5/12/15), Tr. 1316-1318 (7/21/15), Tr. 1311-1314 (8/18/15), Tr. 1307-1309 (9/17/15).

Initially, Alexander was prescribed Zoloft and Latuda.  Tr. 480-483, 493-495.  On December 20, 2013, Alexander reported that she was "doing okay," but she also reported that she stopped taking Latuda because it made her feel horrible.  Tr. 480.  She reported an increase in

---

[9] Throughout this period, Alexander's medication visit notes continued to reflect a diagnosis of major depressive disorder, recurrent, severe without psychotic features and a GAF 50.

suicidal ideation, depression and anxiety.  Tr. 480.  Also, Alexander felt that Zoloft was not

helping.  Tr. 480.  Alexander's Latuda was discontinued and she was started on Abilify.  Tr. 482.

Her Zoloft was continued.  Tr. 482.  On January 21, 2014, Alexander reported that she was doing

good.  Tr. 464.  She was experiencing increased aggression and decreased concentration but her

depression was gone.  Tr. 464.  She was eating and sleeping well.  Tr. 464.  Alexander's Abilify

and Zoloft were continued and she was started on Cogentin.  Tr. 466.   On January 31, 2014,

Alexander was doing well; she reported she had been stable with very few stressors.  Tr. 452.

She indicated that Cogentin was working well for her.  Tr. 452.  She denied any major

depression or anxiety.  Tr. 452.  During visits in February 2014, Alexander continued to report

that she was doing well.  Tr. 423, 438.

On April 1, 2014, Alexander reported a 12 pound weight gain since February.  Tr. 655.

She felt that her life was not going the way she wanted it to but she was hopeful that it would get

better soon.  Tr. 655.  A week later, during an April 9, 2014, visit, Alexander indicated that her

mood was good and stable.  Tr. 661.  She relayed that she felt like she was finally on the right

medications.  Tr. 661.  She was eating a lot and was encouraged to watch her diet and increase

her exercise.  Tr. 661.  She was working with case management services to find housing and a

job.  Tr. 661.  She had started living with a new friend whom she met in group therapy.  Tr. 661.

Her living arrangements were going well.  Tr. 661.  Alexander continued to take Cogentin,

Abilify and Zoloft.  Tr. 663.

In June 2014, Alexander reported that her medications were not working as well as they

had been.  Tr.  838.  Alexander continued to be homeless and was living between friends' homes,

her daughter's home, and her car.  Tr. 838.  She was agreeable to an increase in her Zoloft.  Tr.

838.  The following month, Alexander reporting doing well and indicated that her depression

varied from day-to-day. Tr. 833. She denied any anxiety and denied any drug or alcohol use. Tr. 833. She was sleeping and eating well. Tr. 834. In September 2014, Alexander was slightly depressed due to her situation. Tr. 828. She continued to be homeless – she was living in her car or with friends. Tr. 828. Alexander was working 24 hours a week at the County Rec Center to get help with food. Tr. 828. She was continuing to gain weight and was reminded to watch her diet and exercise. Tr. 828. On October 16, 2014, Alexander relayed that she now had her own one bedroom apartment and was very excited about it. Tr. 823. Her mood was stable. Tr. 823. She was having difficulty sleeping. Tr. 823. In December 2014, Alexander's mood remained stable. Tr. 1271. She was continuing to take Abilify, Cogentin, and Zoloft. Tr. 1271.

In February 2015, Alexander reported some depression. Tr. 1266. She was upset about her weight gain of almost 50 pounds. Tr. 1266. She was eating every hour and indicated she was unable to exercise. Tr. 1266. Alexander also reported difficulty sleeping. Tr. 1266. Alexander was instructed to continue to take Cogentin, Abilify, and Zoloft. Tr. 1268. New medications were added – Topamax[10] for her appetite and Trazadone for her sleep. Tr. 1266, 1268.

During a follow-up visit on April 9, 2015, Alexander reported that, since February, she had been experiencing a lot of confusion. Tr. 1262. She had been seen in the emergency room for confusion. Tr. 1262. Also, Alexander was not remembering things immediately after being told things. Tr. 1262. The emergency room toxicology screen showed methamphetamines in her system. Tr. 1262. Alexander denied drug or alcohol use and explained that she had smoked a rolled cigarette that a friend gave her, which she suggested was the only way she could have ingested the drug. Tr. 1262. Alexander felt that the Topamax was helping curb her appetite. Tr.

---

[10] Topamax is the brand name for topiramate. https://www.drugs.com/cdi/topiramate-tablets.html (last visited 9/28/2017).

1262.  However, Topamax was discontinued out of concern that Alexander's confusion was related to the addition of Topamax.  Tr. 1262.  Alexander was continuing to attend therapy.  Tr. 1262.

In May 2015, Alexander reported that, since discontinuing Topamax, there had been some improvement with respect to her confusion and memory.  Tr. 1257.  She had seen her primary care physician regarding her confusion and her primary care physician felt that Alexander's confusion and memory loss was not from Alzheimer's but from some source of dementia.  Tr. 1257.  Her primary care physician added Aricept to her medications.  Tr. 1257.

Throughout July, August and September 2015, Alexander reported some depression and anxiety and she continued to have some memory problems.  Tr. 1307, 1311, 1316.  She reported not taking her medications due to forgetfulness.  Tr. 1307.  She was walking with her sister for exercise.  Tr. 1307, 1311, 1316.  She was also spending more time with her children and had been attending her granddaughter's cheerleading events.  Tr. 1307.  She was not sleeping well at night because she was sleeping during the day.  Tr. 1307.  As of September 2015, her medication regimen continued to include Cogentin, Abilify, Zoloft, and Aricept.  Tr. 1308.

In addition to medication management services during this period, Alexander received individual[11] and group counseling  (*see e.g.*, Tr. 531-532 (10/31/13), Tr. 511-512 (11/12/13), Tr. 509-510 (11/19/13), Tr. 497-498 (12/5/13), Tr. 487-488 (12/10/13), Tr. 491-492 (12/17/13), Tr. 436-437 (2/18/14), Tr. 1305-1306 (5/29/15), Tr. 1303-1304 (7/21/15), Tr. 1301-1302 (8/18/15)) and case management services,[12] which included providing assistance with housing, meeting basic needs, and finding resources to assist Alexander with looking for a job (*see e.g.*, Tr. 421-

---

[11] Alexander's individual counselor was Ashley Nelson, PC.

[12] Alexander's case management services were primarily provided by Lydia Velasquez.

422 (2/26/14), Tr. 795-796 (3/7/14), Tr. 791-792 (3/13/14), Tr. 769-770 (4/4/14), Tr. 759-760 (4/21/14), Tr. 755-756 (4/30/14), Tr. 749-750 (5/6/14), Tr. 741-742 (5/28/14), Tr. 735-736 (6/12/14), Tr. 729-730, 731-732 (6/20/14), Tr. 723-724 (6/25/14), Tr. 713-714 (7/23/14), Tr. 703-704 (8/19/14), Tr. 693-694 (9/15/14), Tr. 909-910 (10/14/14), Tr. 1228-1229 (11/26/14), Tr. 1220-1221 (12/18/14), Tr. 1202-1203 (1/29/15), Tr. 1198-1199 (2/12/15); Tr. 1136-1137 (5/20/15)).

On February 26, 2015, Alexander called Ms. Velasquez stating that a friend had told her that she "looked drunk" the other day. Tr. 1194. Ms. Velasquez noted that over the prior couple of months Alexander had been complaining of memory loss, confusion, trouble standing and getting up after sitting, and dizziness. Tr. 1194. Ms. Velasquez proceeded to meet with Alexander and accompany her to the emergency room. Tr. 1194. When Ms. Velasquez met with Alexander she appeared bright and pleasant and looked healthy. Tr. 1194. At the emergency room, Alexander's symptoms, e.g., memory loss, confusion, were relayed to the doctor. Tr. 1194. Alexander also explained to the doctor that she had tingling in her left leg and numbness, leg pain when standing up, and changes in her vision. Tr. 1194. A toxicology screen was positive for amphetamines. Tr. 1076. Alexander was diagnosed with alteration of consciousness and urinary tract infection. Tr. 1072. A head CT scan showed that "[n]o convincing evidence for acute intracranial hemorrhage [was] seen." Tr. 1090. A chest x-ray taken that same day showed "[m]inimal subsegmental atelectasis left lung base." Tr. 1091.

### e. River Road Family Physicians (March 2015 through August 2015)

On March 5, 2015, Alexander saw Dr. Evans following her February 26, 2015, emergency room visit. Tr. 1099-1101. Alexander's chief complaint was confusion. Tr. 1099. With respect to the emergency room toxicology report that was positive for amphetamines,

Alexander denied actively trying to take amphetamines. Tr. 1099. She indicated that she had accepted a rolled cigarette from a friend and wondered if it had been laced. Tr. 1099. On examination, Dr. Evans observed that Alexander was oriented to person, place, and time; her affect was normal; her speech was normal; and her insight and judgment were intact. Tr. 1101. Dr. Evans' assessment was insomnia. Tr. 1101. Dr. Evans adjusted Alexander's Trazadone dosage. Tr. 1101.

On April 16, 2015, Alexander saw Dr. Evans for follow up regarding her memory loss and confusion. Tr. 1096-1098. Alexander reported being very forgetful. Tr. 1096. For example, she would order something and forget what she ordered or she would have to ask people to repeat themselves. Tr. 1096. Alexander's case worker recalled that Alexander's memory problems had started around the time she was put on topiramate to help her with weight loss and, since being taken off of topiramate, Alexander noticed some improvement with her symptoms. Tr. 1096. On examination, Alexander's orientation, memory, attention, language and fund of knowledge were normal and her mood and affect were appropriate. Tr. 1097. Her insight was impaired. Tr. 1097. However, her judgment was intact. Tr. 1097. Dr. Evans assessment was memory loss or impairment. Tr. 1098. He instructed Alexander to stay off the topiramate, to do crossword puzzles, and to actively read non-fiction books regarding a topic Alexander is interested in learning about. Tr. 1098.

On May 7, 2015, Alexander saw Dr. Evans again for her memory issues. Tr. 1093-1095. Alexander reported that her memory seemed to be a little better. Tr. 1093. However, she felt like words were just not coming to her. Tr. 1093. Alexander was interested in going back to work but was not sure she would be able to with the problems she was having with her memory. Tr. 1093. On examination, Dr. Evans observed that Alexander was alert; she was oriented to

person, place and time; her short term memory was impaired but her remote memory and recent registration memory were intact; her mood and affect were anxious; her insight was impaired; and her judgment was intact. Tr. 1094. Dr. Evans' assessment was memory loss or impairment and depression. Tr. 1095. Dr. Evans started Alexander on Donepezil and instructed her to follow up in a month or two. Tr. 1095.

On August 27, 2015, Alexander saw Dr. Evans again regarding her memory loss. Tr. 1296-1298. Alexander reported doing better with her memory loss. Tr. 1296. However, she was still having confusion on a daily basis. Tr. 1296. She had started to write things down which was helping her remember. Tr. 1296. Alexander was "teaching herself how to learn to accommodate with her memory issues." Tr. 1296. She was doing crosswords, walking daily, and checking her phone to help her with dates and times. Tr. 1296. She was still having difficulty understanding explanations provided to her. Tr. 1296. Over the prior two weeks, Alexander reported feeling down, depressed or hopeless and having little interest or pleasure in doing things. Tr. 1296. Dr. Evans' assessment was memory loss or impairment, depression and anxiety. Tr. 1298. He increased Alexander's dosage of Donepezil and continued her on Abilify and Sertraline. Tr. 1298.

### 2. Opinion evidence

#### a. Treating

On October 25, 2015, Dr. Evans completed a form entitled "Assessment of Ability to Do Work-Related Activities (Mental)." Tr. 1324-1325. The form required Dr. Evans to provide his opinion regarding Alexander's functional ability in 14 work-related areas. Tr. 1324-1325. The available ratings were (1) none, meaning absent or minimal limitations; (2) mild, meaning a

slight limitation; (3) moderate, meaning more than a slight limitation; (4) marked, meaning a serious limitation; and (5) extreme, meaning a major limitation. Tr. 1324.

Dr. Evans opined that Alexander had no or minimal limitations in one area – ability to behave in an emotional stable manner. Tr. 1325. Dr. Evans opined that Alexander had moderate limitations in six areas: (1) ability to relate to other people; (2) ability to respond appropriately to supervision; (3) ability to respond appropriately to co-workers; (4) ability to respond to customary work pressures; (5) ability to perform simple tasks; and (6) ability to perform daily activities. Tr. 1324-1325. Dr. Evans opined that Alexander had marked limitations in two areas: (1) ability to sustain a routine without special supervision; and (2) ability to use good judgment. Tr. 1324-1325. Dr. Evans opined that Alexander had extreme limitations in five areas: (1) ability to maintain concentration and attention for extended periods; (2) ability to perform activities within a schedule, maintain regular attendance, and be punctual; (3) ability to understand, carry out and remember instructions; (4) ability to respond appropriately to changes in the work setting; and (5) ability to perform complex, repetitive, or varied tasks. Tr. 1324-1325.

When asked whether the severity of Alexander's limitations existed since at least February 10, 2010, Dr. Evans responded that the problems were first noticed in March of 2015 by a counselor at Harbor. Tr. 1325. Dr. Evans indicated that medication seemed to help a little bit with Alexander's ability to function. Tr. 1325. Dr. Evans listed Alexander's diagnoses as anxiety, depression and memory impairment and noted "It is the memory problems that have become disabling." Tr. 1325. Dr. Evans opined that Alexander's condition would likely deteriorate if she is placed under stress, even that of simple, routine work, and she was not capable of managing benefits in her own best interest. Tr. 1325. He also opined that Alexander would likely be absent five times per month or more due to her impairments or treatment. Tr.

1325.  Dr. Evans provided additional comment regarding his opinion as to Alexander's expected rate of absenteeism, stating:

> As bad as this looks, my main concern is her ability to perform a job without getting confused.  We are still working her up [and] treating her, but this looks to be early onset dementia.  Medication has improved her condition enough to better manage her ADL's at home, but I expect this condition to progressively worsen.

Tr. 1325.

### b.  Consultative

On July 21, 2014, Sonja Stahl Pinsky, M.D., conducted a consultative psychiatric evaluation.  Tr. 678-682.  Alexander provided information regarding her family, educational, work history, and medical history.  Tr. 678-679.  Alexander indicated that she felt "depressed" but was less tearful than in the past.  Tr. 680.  She reported that she was forgetful and had had difficulty concentrating.  Tr. 680.  She indicated that, over the past several years, she had noted an increased difficulty with focus and follow through.  Tr. 680.  Alexander relayed that she worried about "where and how to live."  Tr. 680.  She had been homeless for about a year.  Tr. 681.  She was showering, doing laundry, and eating meals occasionally at a friend's house.  Tr. 681.  She was sleeping in her car.  Tr. 680.  During the day, she visited libraries, went to a park, went on walks, and took naps.  Tr. 681.  She indicated she liked to read.  Tr. 681.  She used to enjoy sewing and golf but no longer engaged in those activities.  Tr. 681.

Dr. Pinsky observed that Alexander's eye contact was adequate, her behavior and speech pattern were unremarkable, and her thinking was clear.  Tr. 680.  Alexander was oriented to time, place and person.  Tr. 680.  Her insight was limited and her judgment was adequate.  Tr. 681.  Alexander reported that she now had a computer and phone, which was helpful because she could look for jobs.  Tr. 681.  She noted, however, that she often did not follow through with the

application process. Tr. 681. She also stated that she was finding it difficult to find a job and her caseworker told her she was not ready to work at that time. Tr. 681.

Dr. Pinsky diagnoses were major depressive disorder, recurrent, by history; rule out bipolar disorder, previous diagnosis; and history of alcohol abuse. Tr. 681. Dr. Pinsky assigned a GAF score of 65.[13] Tr. 681. Dr. Pinsky's functional assessment was as follows:

> 1. Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.
>
> Ms. Alexander said that when working, she had no difficulty understanding, remembering and carrying out instructions.
>
> 2. Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.
>
> When the task became too complicated, sometimes Ms. Alexander felt overwhelmed when she was working. She currently has difficulty completing job applications.
>
> 3. Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.
>
> When working, Ms. Alexander had no difficulty responding appropriately to supervisors and coworkers and said that she was promoted at every job.
>
> 4. Describe the claimant's abilities and limitations in responding appropriately to work pressures in a work setting.
>
> When working, and the work pressures were significant, Ms. Alexander said she would "often drink."

Tr. 682.

---

[13] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR, at 34.

### c. Reviewing

On August 5, 2014, state agency reviewing psychologist Paul Tangeman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 68-69) and a Mental RFC Assessment (Tr. 70-71). As part of the PRT, Dr. Tangeman concluded that Alexander had moderate restrictions/difficulties in activities of daily living and in maintaining concentration, persistence, or pace; no difficulties in maintaining social functioning; and no repeated episodes of decompensation, each of extended duration. Tr. 69.

In the Mental RFC Assessment, Dr. Tangeman concluded that Alexander had no understanding and memory limitations and no social interaction limitations. Tr. 70, 71. Dr. Tangeman found that Alexander had sustained concentration and persistence limitations. Tr. 70-71. More particularly, he opined that Alexander was moderately limited in her ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 70-71. Dr. Tangeman further explained the sustained concentration and persistence limitations, stating that Alexander felt overwhelmed when things become too difficult and, in the past, when work pressures were significant, she would drink. Tr. 71. Also, Dr. Tangeman explained that Alexander could "perform simple routine and moderately complex tasks in settings that are not fast paced and where there are no strict production standards/quotas." Tr. 71. Dr. Tangeman also found that Alexander had adaptation limitations; namely, she was moderately limited in her ability to respond appropriately to

changes in the work setting. Tr. 71. Dr. Tangeman explained further that Alexander could perform work with infrequent changes. Tr. 71.

Upon reconsideration, on November 5, 2014, state agency reviewing psychologist Tonnie Hoyle, Psy.D., also completed a PRT (Tr. 91-92) and Mental RFC Assessment (Tr. 92-94). Dr. Hoyle's PRT differed slightly from Dr. Tangeman's PRT. Tr. 68-69, 91-92. Dr. Hoyle concluded that Alexander had mild restrictions/difficulties in activities of daily living and in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. Tr. 91. Dr. Hoyle found no repeated episodes of decompensation, each of extended duration. Tr. 91. Dr. Hoyle's Mental RFC Assessment was the same as that of Dr. Tangeman's. Tr. 70-71, 93-94.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

Alexander was represented at and testified at the hearing. Tr. 28-57. Alexander felt that her mental impairments, not her physical impairments, prevented her from being able to work. Tr. 51-52. She indicated she has a difficult time concentrating and paying attention for long periods of time and she easily gets overwhelmed. Tr. 52

Alexander has her driver's license, and a car and is able to drive. Tr. 31. She does not drive that often – she usually has her caseworker take her to meetings or appointments. Tr. 31. Also, her sister picks her up almost every day to go on a walk. Tr. 31. Alexander indicated that she usually only drives to go to the grocery store, which she estimated to be about four times each month. Tr. 31.

Alexander discussed her memory issues and confusion. Tr. 41-42. She experiences those symptoms every day. Tr. 41. As an example of what she experiences, Alexander explained that

she went through a drive-thru fast-food window, ordered two items and, when asked to repeat the items back, she was unable to remember the second item she ordered. Tr. 41. She remembers some things, such as paying her rent and appointments, by writing reminders on a calendar. Tr. 42. Alexander can usually understand things that she reads. Tr. 51. If she has problems with understanding certain things, her caseworker assists her. Tr. 51.

Alexander indicated she has some depression. Tr. 42-43. She explained that, at that moment during the hearing, she could probably cry – she felt anxious about the hearing. Tr. 42. Alexander used to cry daily until she started treatment at Harbor. Tr. 43. Medication helped control her crying spells but she felt that she had been struggling with things more recently. Tr. 43. Alexander experiences stress and anxiety. Tr. 43-44. She indicated she was concerned about what the future holds for her, indicating her preference would be to be healthy and working. Tr. 44. She indicated that she feels hopeless and helpless and like she has no control over her life. Tr. 44. Medication had been helping in the past with her reported symptoms but she was going to see her nurse and anticipated that some medication changes might be made. Tr. 44.

On occasion, Alexander experiences panic attacks. Tr. 55. When things were going a little bit better in her life, she indicated she could fight them a little better. Tr. 55. She does not know what causes her panic attacks. Tr. 55. As an example, she indicated that she was going to a vocational meeting with her caseworker and, when they arrived in the parking lot, she just felt she could not even walk into the building. Tr. 55. She did eventually end up going into the building. Tr. 55.

When asked about her past history of alcohol abuse, Alexander indicated that she stopped heavy drinking when she started treatment at Harbor. Tr. 45. Once she stopped drinking she felt

better but she did not really notice any effect on her depression.  Tr. 45.  She drank in the past to

drown out her problems.  Tr. 35.  Alexander did not think that the pressures associated with a

return to work would result in her drinking again.  Tr. 53.

Just about every day, Alexander's sister picks her up and they go walking in a park.  Tr.

46.  Alexander often feels like she does not want to get out of bed to go walking but she still gets

up and goes.  Tr. 46.  Even though Alexander takes sleeping pills, she still has problems sleeping

at night.  Tr. 47.  She sleeps a lot during the day.  Tr. 47.  Since Alexander does not have a lot

going on, it has been suggested that Alexander consider volunteering or going to school.  Tr. 47.

She is not sure that going back to school is an option for her.  Tr. 47.  She is interested in

volunteering but has concerns about her own dependability.  Tr. 48.  For example, she does not

have income so she cannot pay for gas and she is struggling with finding clothes that fit her

current size.  Tr. 48.  Alexander estimated gaining about 50 pounds over a 6 month period.  Tr.

30.

When Alexander watches television, she can generally follow along with the program.

Tr. 48-49.   During the day, Alexander listens to the radio.  Tr. 49.  Although Alexander would

like to try to do other things, e.g., sew, hit golf balls, her lack of finances prevents her from doing

things.  Tr. 49.  She has a piano that that she enjoys playing.  Tr. 49.  Alexander procrastinates

often and puts things off as long as she can.  Tr. 54.  Some days, Alexander spends the entire day

on the couch.  Tr. 54.  Alexander's depression was affecting her ability to dress herself at the

time of the hearing because she had no clothes that fit her.  Tr. 54.

When asked to explain an instance in March 2015 when Alexander tested positive for

methamphetamines, Alexander was unable to say why she tested positive.  Tr. 49-50.  She

indicated that she had just started to take sleeping pills and diet pills and speculated that the

combination of all the medication she was taking was the cause of the positive test result. Tr. 50. She also speculated that maybe someone had put something in her drink. Tr. 50.

Alexander had worked with the Bureau of Vocational Rehabilitation ("BVR") regarding possible work opportunities. Tr. 50. BVR ultimately informed Alexander that services were no longer expected to benefit her with respect to employment because of the severity of her disability and because Dr. Evans had indicated that she was suffering from memory issues and she could not reliably work unless her condition was corrected. Tr. 50-51.

## 2. Vocational Expert

Vocational Expert ("VE") Matthew C. Lampley testified at the hearing. Tr. 57-62. The VE described Alexander's escrow clerk and financial aid counselor positions as sedentary, SVP 5 positions and her human resources clerk position as a sedentary, SVP 4 position.[14] Tr. 59.

The ALJ asked the VE to assume a hypothetical individual of Alexander's age and education and with her past work experience who has no exertional limitations but is limited to understanding, remembering, and carrying out simple, routine tasks; there should be no work requiring a high-quota production-rate pace, i.e., rapid assembly line work where coworkers are side-by-side and the work of one affects the work of the other; can make judgments on simple work and respond appropriately to usual work situations in a routine work setting that is repetitive from day-to-day; and changes should be easily explained and no more than occasional. Tr. 59-60. The VE indicated that the described individual would be unable to perform Alexander's past work due to the skill level. Tr. 60. However, the VE indicated that there were

---

[14] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin. December 4, 2000). Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT. *Id.*

other jobs that the described individual could perform, including produce weigher, sorter, and cleaner. Tr. 61. The VE described all three jobs identified as light, unskilled positions. Tr. 61.

In response to further questioning by the ALJ, the VE indicated that an additional restriction of needing a work environment without changes in the work activity would be more consistent with a sheltered work environment. Tr. 61. The VE also indicated that on-task requirements for regular occupations is 90 percent on task, not including regular breaks, and the tolerance for allowable absences is no more than one day per calendar month. Tr. 62.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[15] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

---

[15] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[16] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[17] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her December 11, 2015, decision, the ALJ made the following findings:[18]

1. Alexander meets the insured status requirements through March 31, 2013. Tr. 114.

---

[16] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

[17] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[18] The ALJ's findings are summarized.

2.  Alexander engaged in substantial gainful activity after her alleged onset date, from February 2010 to July 2010. Tr. 114.

3.  Alexander earned income in 2013 but did not engage in substantial gainful activity after July 2010. Tr. 115.

4.  Alexander has the following severe impairments: major depressive disorder and anxiety disorder. Tr. 115.

5.  Alexander does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 116-118.

6.  Alexander has the RFC to perform a full range of work at all exertional levels but with nonexertional limitations. Specifically, Alexander is limited to understanding, remembering and carrying out simple, routine and repetitive tasks. There should be no work requiring a high-quota production-rate pace (i.e., rapid assembly line work where co-workers are side-by-side and the work of one affects the work of the other). She may make judgments on simple work, and respond appropriately to usual work situations in a routine work setting that is repetitive from day to day. Changes should be easily explained and no more than occasional. Tr. 118-121.

7.  Alexander is unable to perform any past relevant work due to the skill level. Tr. 121.

8.  Alexander was born in 1956 and was 54 years old, defined as an individual closely approaching advanced age, on the alleged disability onset date. Tr. 121.

9.  Alexander has at least a high school education and is able to communicate in English. Tr. 121.

10. Transferability of job skills is not material to the determination of disability. Tr. 122.

11. Considering Alexander's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Alexander can perform, including produce weigher, sorter, and cleaner. Tr. 122.

Based on the foregoing, the ALJ determined that Alexander was not under a disability, as defined in the Social Security Act, from February 10, 2010, through the date of the decision. Tr. 123.

## V. Parties' Arguments

Alexander's sole argument is that the ALJ violated the treating physician rule when weighing the opinion of Dr. Evans. The Commissioner argues that the ALJ properly considered Dr. Evans' opinion, adequately accounted for Alexander's mental impairments in the RFC, and that the RFC and Step Five determination are supported by substantial evidence.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a

reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      The ALJ did not commit reversible error when evaluating Dr. Evans' opinion**

Alexander argues that the ALJ failed to satisfy the requirements of the treating physician rule when weighing the opinion of her treating physician Dr. Evans. As more fully explained below, the Court finds no reversible error.

**1.   Treating physician rule**

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of

the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c). An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Further, while the treating physician rule is an important procedural safeguard, it "is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010).

## 2. The ALJ's consideration of Dr. Evans' opinion under the treating physician rule

When considering Dr. Evans' opinion, the ALJ explained:

> In this case, this assessment is given partial support as the limitations proposed by Dr. Evans are not supported by the record as a whole, nor consistent with the opinion given by the initial or reconsideration level State agency consultants or by the consultative examiner.

Tr. 121.

Here, the ALJ did assign weight to Dr. Evans' opinion, explaining that only partial support was being assigned because of the lack of supportability and consistency of Dr. Evans' opinion with evidence of record. Alexander contends that the ALJ's explanation is insufficient to satisfy the treating physician rule. However, the Court finds that the ALJ's explanation of the weight assigned to Dr. Evans' opinion along with her discussion of the evidence is sufficiently clear to allow this Court to assess whether the ALJ's weighing of Dr. Evans' opinion is supported by substantial evidence.

Initially, the Court observes that, when assessing the extent of Alexander's difficulties with concentration, persistence or pace, the ALJ found only moderate difficulties, explaining that

> [Alexander] remained focused and engaged throughout the pendency of the hearing in this matter, which lasted approximately 50 minutes (Hearing Testimony). She testified cohesively, demonstrating her ability to remain focused on the matter at hand, understand the questions posed to her, organize her thoughts appropriately, and formulate clear and concise responses . . .

Tr. 117.

Further, the ALJ acknowledged that Alexander had a history of depression, anxiety, confusion, and memory issues, but also noted that, "[m]ultiple medical exams, show the claimant with good insight, judgment, intact memory, normal speech, congruent affect, and euthymic mood[]" and Alexander was undergoing therapy, which seemed to be helping. Tr. 119. Additionally, the ALJ noted a normal CT scan of Alexander's head. Tr. 119, 1122. The ALJ also observed evidence indicating Alexander engaged in a normal level of daily activity and was able to work since the alleged onset date. Tr. 114-115, 119. Considering this and other evidence, the ALJ found that Alexander was not as limited as Dr. Evans opined. Tr. 119.

Additionally, Dr. Evans indicated that Alexander's problems were first noticed in March 2015 and did not date back to the February 10, 2010, alleged onset date. Tr. 1325. Further, while Dr. Evans opined that "It is [Alexander's] memory problems that have become disabling[,]" he also indicated "[w]e are still working her up [and] treating her, but this looks like early onset dementia." Tr. 1325. Consistent with this evidence, the ALJ concluded that there was no actual diagnosis for Alexander's reported symptoms of memory issues and confusion and medical records reflected that testing was still being done to determine the cause of those symptoms. Tr. 116 (referring to Exhibit 16F (Dr. Evans' October 25, 2015, opinion)).

In addition to finding Dr. Evans' opinion unsupported by the record as a whole, the ALJ also found Dr. Evans' opinion to be inconsistent with the other medical opinions of record. Tr. 117. Alexander takes issue with the ALJ's decision to discount Dr. Evans' opinion because it was inconsistent with opinions of non-treating and non-examining doctors. Doc. 16, p. 20, Doc. 19, p. 3 (relying on *Hensley v. Astrue*, 573 F.3d 263, 266-267 (6th Cir. 2009)). However, here, unlike in *Hensley*, the ALJ did not discount Dr. Evans' opinion based solely on inconsistencies with the state agency reviewing and consultative psychologists. As indicated, the ALJ discussed and considered the evidence as a whole, including testimonial and medical evidence, and concluded that Dr. Evans' opinion was not supported by the evidence.

Based on the foregoing, the Court finds the ALJ properly considered and weighed the opinion of treating physician Dr. Evans and her decision is supported by substantial evidence. Further, even if the ALJ's assessment of Dr. Evans' opinion were deemed to fall short of strict compliance with the treating physician rule, the Court finds error, if any, to be harmless because "the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion[.]" *Friend*, 375 Fed. Appx. at 551; *Wilson*, 378 F.3d at 547 (Violation of treating physician rule may be "harmless error" "where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation."). Accordingly, the Court finds no basis upon which to reverse the Commissioner's decision.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: September  28, 2017

Kathleen B. Burke
United States Magistrate Judge